## O. S. Richardson Fueling Company v. Claudius Peters, Adm'r.

1. DAMAGES—*Death From Negligent Act—Effect of Remarriage of the Widow.*—The fact of the marriage of the widow of a person killed through the negligence of another and that her present husband stands in *loco parentis* to the children can not be considered in fixing the amount of damages.

Action in Case.—Death from negligent act. Trial in the Circuit Court of Cook County; the Hon. CHARLES A. BISHOP, Judge, presiding. Verdict and judgment for plaintiff; appeal by defendant, Heard in this court at the October term, 1898. Affirmed. Opinion filed May 22, 1899.

WM. M. JOHNSON, attorney for appellant.

JAMES V. O'DONNELL, attorney for appellee.

MR. JUSTICE ADAMS delivered the opinion of the court.

This is an appeal from a judgment for $5,000 in favor of appellee and against appellant, rendered on the verdict of a jury in an action in case for the alleged negligence of appellant, which is claimed to have caused the death of John Paczkowski, plaintiff's intestate.  August 24, 1895, the plaintiff's intestate and five other men were employed by appellant to load coal from appellant's scow onto the steamer Petoskey.  While the intestate was so employed he fell off the scow into the water and was drowned.  He left him surviving Martha, his wife, and four children, the eldest of whom was, at the time of the trial, about eight years and the youngest about three years of age.  The deceased was thirty-three years of age at the time of his death, had been in this country about twelve years, was earning $1.75 per day, and, in his lifetime, supported his wife and children. His widow married again in August, 1896, her present married name being Martha Schroeder.

The accident occurred in a slip called the Michigan slip, which is off from and west of Lake Michigan.  The slip is about eighty feet in width from north to south.  At the time of the accident the steamer Kalamazoo was on the north side and the steamer Petoskey on the south side of the slip; the bows of the two steamers pointing east toward the lake, and their sterns being at the west end of the slip. The dimensions of the steamers are : Kalamazoo, 161 and 7-10 feet in length; beam, 31 and 5-10 feet; Petoskey, 171 feet 3 inches long; 30 feet and 4 inches beam.  The scow is 87 feet in length by 22 feet in width and lay in the slip between the two steamers, and its west end was fastened to the Petoskey at about the middle gangway of the latter for the purpose of loading the coal into the vessel from the scow.  How far the scow and Petoskey were apart at the point where they were fastened together, does not exactly appear.  Some of the witnesses say three or four feet, or maybe less.  The east end of the scow was not fastened to the steamer.  The deck of the steamer was higher than the scow, and from it to about the middle of the scow's deck

a gangplank was extended, up which the men wheeled the coal in wheelbarrows to the Petoskey. The deck of the scow was a horizontal plane, in shape a rectangular parallelogram, its ends and sides straight and unprotected by guards of any kind. The coal was in the east end of the scow.

Appellee's intestate and the other men employed with him, went to work loading the coal from the scow onto the steamer Petoskey, in the evening of August 24, 1895. The exact time they commenced work can not be ascertained from the evidence, but the preponderance of the evidence is that it was dark. There were no lights on the scow. There was a light on the Petoskey which shed light on the gangplank but not on or near the coal pile from which the men wheeled the coal. The deceased was loading coal into a wheelbarrow from the east end of the scow and near to its south side, the side nearest the Petoskey. When he loaded his wheelbarrow he started in a northwesterly direction to the end of the gangplank, which, as before stated, reached to about the middle of the deck of the scow; thence he wheeled the coal up the gangplank into the steamer. The construction of the deck of the scow is thus stated by appellant's witnesses: The deck consisted of two-inch timber covered with a sheathing of inch stuff dressed down to about seven-eighths of an inch. It is admitted that there was a depression in the deck, called by appellee's witnesses a hole, but there is a conflict of evidence as to the dimensions of the depression and its situation in reference to the south side of the scow. One of appellee's witnesses testified that the hole or depression extended from the south edge of the scow north eight feet, another six to ten feet, and that it was from eight to ten inches wide, and both that it was about one and one-half or two inches in depth. One of appellant's witnesses testified that he knew the condition of the scow; that there might have been holes in the deck through the sheathing, near the coal pile; that he couldn't just say; that he did not know of any spot on the deck where there was a hole through the lower floor. Another

O. S. Richardson Fueling Co. v. Peters.

of appellant's witnesses testified that one piece of the sheathing was out, leaving a depression three to four feet in length and about six or eight inches wide, the nearest point of which to the edge of the scow was five feet. Another of appellant's witnesses testified that two or three days after the accident he examined the deck and that there was no hole in it. The evidence tends to show that the scow was an old one. The wheelbarrows used by the men were made of iron, with wheels about eighteen inches in diameter, and, when loaded, carried at least 300 pounds of coal. Two of appellee's witnesses testified that the wheelbarrow furnished to and used by the deceased was an old one, the bottom, handles and wheel of which were loose and shaky. One of them testified that a man could not steady it. Appellant's evidence tends to contradict that of appellee's witnesses as to the condition of the wheelbarrow. The evidence shows that between ten and eleven o'clock at night, when it was dark, the deceased had loaded his wheelbarrow with coal at the south side of the scow and near to its edge, and that he started for the end of the gangplank; that the hole or depression was near to where he loaded the wheelbarrow, and on his route to the gangplank, and that, about where the hole was he fell into the slip and was drowned. His wheelbarrow fell in at the same time. It does not appear that the deceased ever worked on the scow, or used the wheelbarrow in question, before that night, but it appears from the evidence that he had wheeled quite a number of loads over it that night before the accident.

One of appellee's witnesses, who testified through an interpreter, thus describes the accident:

"I saw John fall into the lake. I was standing there and was looking toward him. I saw the place where he fell in. The boat was about five feet away from the Petoskey, and the other end might have been about twelve feet, and then I seen a hole which was about eight feet long at the place where he had to cross with his wheelbarrow, which was about eight inches wide and two inches thick. The scow was standing toward the north. John was taking the wheelbarrow; he was pushing it across the hole; then the wheelbarrow kicked up and hit him in the leg and

threw him into the river, and I went to save him, but I could not do it."

Appellant's counsel contends that the verdict is contrary to the evidence; that the preponderance of the evidence is against it. In view of the conflict of evidence as to the condition of the scow and the wheelbarrow, we think the questions of the care exercised by the deceased, and the alleged negligence of appellant, were proper questions for the jury, and, after careful consideration of the evidence and the argument of appellant's counsel, we have concluded that we can not disturb the verdict on the ground that it is not supported by the evidence. Counsel for appellant questions the credibility of appellee's witnesses. The credibility of the witnesses was a question for the jury and the court, who saw the witnesses and heard them testify, thus having a better opportunity to judge of their credibility than can a court of review, overruled appellant's motion for a new trial.

Appellant's counsel complain of the refusal of the court to give the following instruction:

"The jury are instructed, as a matter of law, that there can be no recovery against the defendants under that count in his declaration which alleges that the defendants failed to fasten the rear part of the scow to the vessel Petoskey."

We are of opinion that the evidence was not sufficient to support a verdict on the count referred to in the instruction, but are not of opinion that the refusal to give the instruction is reversible error. There are other counts in the declaration charging negligence, which are supported by the evidence. Railroad Co. v. Blumenthal, 160 Ill. 40, 49; Illinois Steel Co. v. Schymanowski, 162 Ib. 447, 457.

The court gave twenty-five instructions for appellant, fully setting forth the reciprocal duties and obligations of the parties.

It is contended that the amount awarded as damages is excessive, and, in support of this contention, it is urged that the widow of the deceased has married again, and has thus secured a new means of support, and that her present hus-

band stand in *loco parentis* to the children. We think this view untenable, and do not regard the amount of damages ground for reversal.

We find no reversible error in the record.

The judgment will be affirmed.