### THE CITY OF ROME.

### In re OCEAN S. S. CO. OF SAVANNAH.

District Court, S. D. New York.

Nov. 28, 1930.

See also 24 F.(2d) 729.

The report of Commissioner Van Vechten Veeder on damages is as follows:

Pursuant to the interlocutory decree in this cause I have taken proofs as to the amount, validity, and priority of all claims, and I submit herewith my report thereon, both in respect of the claims for death and with regard to the damages sustained by the United States as owner of submarine S–51.

On the night of September 25, 1925, some twelve miles east of Block Island, the steamship City of Rome collided with the United States submarine S–51. The submarine sank, and thirty-three lives were lost. Claim is made in this proceeding for damages resulting from the loss of thirty-two lives. These claims are governed by the Act of March 30, 1920, c. 111 (41 Stat. 537 [46 USCA §§ 761–768]), which reads:

"§ 1. Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued." (46 USCA § 761.)

"§ 2. The recovery in such suit shall be a fair and just compensation for the pecuniary loss sustained by the persons for whose benefit the suit is brought and shall be apportioned among them by the court in proportion to the loss they may severally have suffered by reason of the death of the person

by whose representative the suit is brought." (46 USCA § 762.)

On the face of the statute the specified beneficiaries take severally, not as in the Federal Employers' Liability Act (45 USCA §§ 51–59), in the alternative. In limiting recovery to pecuniary loss, the statute is in accord with the Federal Employers' Liability Act (45 USCA §§ 51–59), as to which the Supreme Court has said: "The damages should be equivalent to compensation for the deprivation of the reasonable expectation of pecuniary benefits that would have resulted from the continued life of the deceased." Chesapeake & Ohio Ry. Co. v. Kelly, 241 U. S. 485, 36 S. Ct. 630, 631, 60 L. Ed. 1117, L. R. A. 1917F, 367. In other words, the beneficiary is to have what might reasonably be expected to accrue had the deceased lived.

 The manifest purpose of Congress was to compensate beneficiaries as fully as money can for the loss sustained. Adequate allowance must, of course, be made for the earning power of money; an ascertained amount based upon the deprivation of future benefits must be discounted to make it equivalent to their present value. Chesapeake & Ohio Ry. Co. v. Kelly, supra. Thus circumscribed, the assessment of damages resulting from loss of life comprises many elements. The deceased's age, his earning capacity, his surviving beneficiaries, their ages, and his contributions to them, his condition of health, his prospects of advancement, are among the elements to be considered. Drowne v. Great Lakes Transit Corp. (C. C. A.) 5 F.(2d) 58.

This holocaust has not deterred me from the most careful consideration of each individual case in the light of every material element of pecuniary loss. Before dealing with them separately, I may avoid repetition by considering first some features common to all the claims, or applicable to various groups.

The deceased were, with few exceptions, very young. Their expectancy of life was therefore high. Computation of expectancy of life is, after all, based upon averages, and is quite as useful as a check as it is as a guide. For "no man knows when the night cometh"; nor is he wiser with knowledge of his expectancy of life.

The deceased were employed in the naval service. Hence their earning capacity was fixed and readily ascertained. Their prospects of advancement were, within certain limits, reasonably assured. But I have not felt justified in attaching particular importance to the prospects of promotion of commissioned officers beyond the grade of lieu-

tenant commander, because further promotion is dependent upon selection. Similarly, in the case of enlisted men, I have felt that particular consideration of their prospects of promotion should be confined to the term of their enlistment. Of course, repeated enlistment indicates a more settled purpose to continue in the service.

The testimony concerning actual contributions by the deceased is often so casual and vague that I have had to rely finally upon my judgment of the credibility of the witness. And all these men were so young that there was hardly an instance of a seasoned record of conduct upon which habit could be predicated. Most of the married men had been recently married; their wives were young; and, even where there were children, the family life had been so short that it afforded little or no forecast.

Having headquarters at New London, the married officers usually maintained a home ashore; married enlisted men seldom did so. Although some of the officers deposited their entire pay in a joint account, a specific allowance to wives was common among both officers and enlisted men. Where there were children, this allowance commonly approximated the whole pay received. When a man maintained a home ashore on a specific allowance to his wife, I have generally estimated that the interest of his widow in the allowance was at least one-half. Where there is a child, I have proceeded upon the common experience in life that the father and mother diminished their individual interest to bring up the child. Similarly, when the surviving beneficiaries are mother and child, where the statute requires the interests of each to be specified, the mother's portion is generally smaller than it would be had she been childless. This seems to be inevitable in the division of a given sum; the compensations of motherhood are seldom pecuniary.

The government contends that the pecuniary interest of a child should be limited to minority. No fixed rule can be followed. Birkett v. Knickerbocker Ice Co., 110 N. Y. 504, 18 N. E. 108. But there is much to be said for it in practical operation, at least with male children. In general, it is the American way of life that children should support themselves by the time they attain their majority. Indeed, in the limited scale of living available to the families of these enlisted men, the children would ordinarily be expected to be self supporting at an earlier age. An officer's mode of life might afford exceptions; yet, if a son follows his father in the naval service, as often happens, he

338

would be self-supporting before attaining majority.

Several of the widows who are claimants have remarried. The government contends that in such cases the pecuniary loss is limited to the date of remarriage; her pecuniary loss is viewed in terms of her marital status and the consequent right to support, and, when that is restored by remarriage, her loss is said to have been recouped. But the uniform course of authority for more than a generation is to the effect that remarriage of a widow neither bars nor mitigates her pecuniary loss arising out of the death of her husband. Lees v. New York Consolidated Railroad Co., 109 Misc. Rep. 609, 180 N. Y. S. 546, affirmed 193 App. Div. 882, 182 N. Y. S. 933; Chicago & Eastern Illinois Railroad Co. v. Driscoll, 207 Ill. 9, 69 N. E. 620; O. S. Richardson Fueling Co. v. Peters, 82 Ill. App. 508; Davis v. Guarnieri, 45 Ohio St. 470, 15 N. E. 350, 4 Am. St. Rep. 548; Philpott v. Pennsylvania Railroad Co., 175 Pa. 570, 34 A. 856; Wabash Railroad Co. v. Gretzinger, 182 Ind. 155, 104 N. E. 69; Consolidated Stone Co. v. Morgan, 160 Ind. 241, 66 N. E. 696; Katz v. Northern Kansas City Development Co. (Mo. App.) 14 S.W.(2d) 701; Platt v. Cape Girardeau Bell Telephone Co. (Mo. App.) 12 S.W.(2d) 933; Davis v. Springfield Hospital, 204 Mo. App. 626, 218 S. W. 696; Dimmey v. Railroad Co., 27 W. Va. 50, 55 Am. Rep. 292; Georgia Railroad Co. v. Garr, 57 Ga. 277, 24 Am. Rep. 492; Archer v. Bowling, 166 Ky. 139, 179 S. W. 15; Jones v. Kansas City Southern Railway Co., 137 La. 178, 68 So. 401; Gulf, Colorado & Santa Fe Railway Co. v. Younger, 90 Tex. 387, 38 S. W. 1121; Gulf, Colorado & Santa Fe Railway Co. v. Moser (Tex. Civ. App.) 277 S. W. 722; Texas Electric Railway v. Stewart (Tex. Civ. App.) 217 S. W. 1081; International & G. N. Railway Co. v. Boykin (Tex. Civ. App.) 85 S. W. 1163; St. Louis, Iron Mountain & Southern Railway Co. v. Cleere, 76 Ark. 377, 88 S. W. 995. Bangor & Aroostook Railroad Co. v. Jones (C. C. A.) 36 F.(2d) 886, and Motor Wheel Corporation v. Dodson (C. C. A.) 23 F.(2d) 282, are not opposed. These cases deal with various phases of this issue; they apply various and dissimilar statutes, and in none of them is the discussion of this issue adequate. Yet the absence of any authority to the contrary is significant. Under such circumstances I have not stopped a widow's pecuniary loss at the date of her remarriage. It would be pure assumption to do so; there is no evidence before me to indicate whether she is as well off pecuniarily, or better or worse, by reason of her remarriage. Nor do I think that any such consideration would be relevant. It may often happen that, by reason of inheritance, or insurance, or by reason of her own industry and superior capacity, a widow may be much better off pecuniarily after her husband's death than she had ever been in his lifetime. No one has ever suggested that such considerations must be taken into account in computing her pecuniary loss. Her remarriage is analogous. The fundamental question is, not her financial situation after her husband's death, but what she might reasonably have expected to receive from him had he lived.

In the consideration of the cases of the deceased who were unmarried, where the claimants are parents, other factors enter. Inasmuch as the deceased were (with two or three exceptions) of age, the relationship carries, as a rule, no legal obligation of support. There are exceptions, such as Massachusetts General Laws, c. 273, § 20, which makes it a misdemeanor for adult children to fail to provide for the support of destitute parents. But adult children who would ignore such a strong moral obligation could easily evade legal compulsion. Where parents are claimants, therefore, regard must be had solely to actual contribution. Occasional gifts will not form the basis for pecuniary loss, unless they are sufficient to indicate a consistent purpose to contribute. Moreover, the continuity of contributions to parents can hardly be regarded with the same assurance as support of wife and children. It must also be borne in mind that the shorter expectancy of life of the parents prevails.

In the application of these views, I proceed to the particular consideration of each one of the deceased with respect to whom claim is made. For convenience, they are arranged in alphabetical order. All statements as to ages have reference to the date of the casualty, September 25, 1925.

Paul Daniel Berk, aged 19, was an engineman, second class, drawing $72 a month, and living pay. In 7 months he would probably have become an engineman, first class, with an increase of $12 a month in his base pay. The claimants are his wife, aged 22, and a child, Paul D. Berk, Jr., who was born February 7, 1926, after his father's death. His wife testified that he contributed between $60 and $65 to the support of the family. The widow is engaged to be married. The pecuniary loss in this case is fixed at $12,-

000. This sum is apportioned $7,000 to the mother and $5,000 to the child.

Ralph E. Cassidy, aged 25, was a gunner's mate, second class, drawing $84 a month. He was on his second enlistment, and was already eligible for promotion to gunner's mate, first class, at an increase base pay of $12 a month. He is survived by his father and mother. But he gave nothing to his father, and during his 8 years' service in the Navy he had given his mother, aged 47, only $425. This was given during the last year of his life, and was given for the purchase of a home. Prior to that he once gave her $100. It is very difficult to fix the pecuniary loss where there is no regular contribution. The indications are that the deceased was disposed to help in emergencies, but that is about all. The mother's pecuniary loss is fixed at $1,500.

Henry Lee Crawford, aged 24, was a radioman, first class, drawing $97.40 a month. He was on his second enlistment. He would not have been eligible for promotion for 2 years. His father and mother survive him, but there is no proof of any contribution to his father. His mother, who is 45, testified that he sent her $15 a month during his first enlistment. He made no regular contribution during his second enlistment, but sent her small sums from time to time. She thought it would average $10 a month. The mother's pecuniary loss is fixed at $1,500.

Rodney Hiram Dobson, aged 32, was a lieutenant, senior grade. He entered the service in 1917. His pay was $336 a month, made up of a base pay of $220, rental allowance, $80, and subsistence, $36. He might have expected promotion to the grade of lieutenant commander in 1937. The claimants are his wife, aged 25, whom he married June 25, 1921, and a son, Rodney Hiram Dobson, Jr., aged 2 years. The family lived in New London, Conn. Lieutenant Dobson paid $320 a month into a joint bank account, out of which the family disbursements were made. Mrs. Dobson remarried May 24, 1928. The pecuniary loss in this case is fixed at $35,000. This sum is apportioned $19,000 to the mother and $16,000 to the child.

Allen Clifford Earle, aged 25, was an engineman, first class, drawing $97.40 a month. He was on his second enlistment. In 7 months he could reasonably have expected promotion to chief machinist's mate, with an increase in base pay of $15 a month for the first year and $42 a month thereafter. The claimants are his wife, aged 26, and a son,

Allen Earle, Jr., aged about 2. His wife, whom he married June 24, 1923, testified that he contributed all his pay, save $10 a month, to the support of the family. Mrs. Earle remarried July 8, 1928. The pecuniary loss in this case is fixed at $14,000. This sum is apportioned $8,000 to the mother and $6,000 to the child.

Edmund Webster Egbert, aged 24, was an ensign. He entered the service as a midshipman in 1919. His prospects of promotion were lieutenant, junior grade, in 1926; lieutenant in 1931, lieutenant commander in 1943. His pay was $183 a month, made up of $125 base pay, rental allowance, $40, and subsistence, $18. The claimants are his wife, aged 21, and a son, Edmund Webster Egbert, Jr., aged 3 months. His wife, who married the deceased April 5, 1924, testified that the entire income of the deceased was used for the upkeep of their home. Mrs. Egbert remarried May 19, 1928. The pecuniary loss in this case is fixed at $22,000. This sum is apportioned $12,000 to the mother and $10,000 to the child.

Harry Dick Elser was a coxswain, drawing a base pay of $60 per month, which, with other allowances, aggregated $71 monthly. He was nearly 26. He enlisted in 1918, and was therefore well on in his second enlistment. On the date of his death he was eligible for promotion to boatswain's mate, second class, in which the base pay is $72 per month. The claimant is his father, aged 50. During the last year or two he had received $30 or $40 a month from his son. His pecuniary loss is fixed at $4,300.

Rudy Firm, aged 25, was a machinist's mate, first class, drawing $97.40 a month. He was on his second enlistment, and could not have expected promotion unless he enlisted a third time. The claimant is his mother, aged 53, who is apparently infirm, and is supported by her children. Her testimony is to the effect that the deceased contributed $20 a month. Her pecuniary loss is fixed at $2,500.

Frederick D. Foster, aged 26, was a lieutenant, junior grade. He was appointed a midshipman in 1918. His pay was $271 a month, made up of $175 base pay, $60 rental allowance, and $36 subsistence. He would probably have been a lieutenant, senior grade, in 1929, and lieutenant commander in 1942. The claimants are his wife, aged 28, whom he married June 4, 1924, and a daughter, Frances Lloyd Foster, aged 4. The family lived at New London, Conn. Lieutenant

Foster paid about $225 a month in a joint bank account, out of which the family expenses were paid. The pecuniary loss in this case is fixed at $28,000. This sum is apportioned $16,000 to the mother and $12,000 to the child.

■ John Law Gibson, aged 24, was an engineman, second class, drawing $84.20 a month. He was on his second enlistment. In 1 year and 3 months he could have expected promotion to engineman, first class, with an increase of $12 a month in his base pay. He left a wife of 18, whom he had married April 5, 1925. She remarried May 21, 1926. During her brief married life with the deceased his pay went to maintain their home.* Her pecuniary loss is fixed at $8,500.

■ Turner Ashby Glascock, aged 28, was a lieutenant, junior grade. His pay, with all allowances, was $356 a month. He would normally have been commissioned lieutenant in 1926, and lieutenant commander in 1939. The claimant is his wife, aged 30, whom he married October 4, 1919. She has valvular heart trouble. They had a joint account, to which he contributed $325 a month. Her pecuniary loss is fixed at $27,000.

■ James D. Haselden, Jr., aged 28, was a lieutenant, junior grade. He was graduated from the Naval Academy June 7, 1919. His base pay was $183 per month, with an allowance of $18 a month for subsistence, or a total of $201 a month. Had he lived to December, 1925, he would probably have become a lieutenant, senior grade, and a lieutenant commander in 1935. He helped his father in a real estate purchase; and since an accident in 1923 his father had been practically dependent upon him. But the father died January 22, 1930, and no claim is made on his behalf. He had two sisters. He contributed to the support of his elder sister, Rebecca Louise, until her education was finished and she married. Then he looked after his younger sister, Mary Lucia, who is the sole claimant; she was also the beneficiary under his will. While she was in high school, he clothed her. During the last 2 years of his life, while Mary Lucia was in college, he gave her $1,000 annually. She continued her college course through part of 1927, having paid her expenses out of the moneys received under her brother's will, namely, $1,000 insurance, 6 months' gratuity, and $100 back pay. But ill health compelled her to withdraw before graduation, and she had 3 months' work to do before she received her degree. She had been teaching at intervals, I gather, since September, 1929. Prior to that time she had not been strong enough to work. The evidence discloses a strong sense of family obligation on Lieut. Haselden's part. She was clearly dependent upon him at the time of his death, and he certainly indicated a purpose to fit his younger sister to support herself. If, having done so much, his sister's bad health made it hazardous for her to attempt to support herself, I think she had substantial expectations of further assistance from her brother. Of course, his own marriage would probably have affected the situation to some extent; but he was unmarried at 28. Her pecuniary loss is fixed at $3,000.

■ Franklin Pierce James, aged 33, was a chief motor machinist's mate, drawing $149.90 a month. He was on his third enlistment, and had reached the highest petty officer grade. The claimants are his wife, aged 37, and a son, Benjamin Franklin James, Jr., aged 5. His wife, whom he married January 3, 1913, testified that he contributed around $140 a month for the support of the family. The son has congenital heart disease and a deformed spine. His expectancy of life is very much reduced by the condition of his heart, which will inevitably prove fatal. He must live a restricted life, and will require support. The pecuniary loss in this case is fixed at $19,000. This sum is apportioned $10,000 to the mother and $9,000 to the child.

■ Walter E. Lawton, aged 27, was an electrician's mate, first class, drawing $101.60 a month. He was on his third enlistment, and within 2 years he could have expected promotion to chief electrician's mate at a base of $99 a month for the first year and $126 a month thereafter. The claimants are his wife, aged 25, and his mother. Substantially his whole income went to pay household expenses. The pecuniary loss of the widow is fixed at $15,000. There is no basis for any award to the mother.

■ Brady D. Lindsay, aged 22, was an engineman, first class, drawing $77 a month. It was his first enlistment. Nine months from the date of his death he would normally have become an engineman, first class, with an increase in base pay of $12 a month. The claimant is his mother, aged 40, to whom he had contributed $30 a month. Her health has been bad during the past 10 years. Her pecuniary loss is fixed at $5,000.

■ John (alias Sylvester) J. McCarthy, aged 20, was a seaman, first class, drawing $59 a month. He was on his first enlistment. In approximately 1 year he would have be-

come a coxswain, with an increase in his base pay of $6 a month. The claimant is his mother, aged 63, to whom he gave "about $25–$30 a month." Her pecuniary loss is fixed at $3,500.

 George Henry Martin, aged 40, was an officer's cook, second class, drawing $95 a month. He was on his fifth enlistment. The claimants are his wife, aged 21, whom he married November 29, 1921, and two sons, George Henry Martin, Jr., aged 1 year, and Leonard Gordon Martin aged 4 months. His wife testified that he had sent her regularly $104 a month, which she supposed was his pay. The pecuniary loss in this case is fixed at $15,000. This sum is apportioned $5,000 to the mother and $5,000 to each child.

 Oscar J. Milot, aged 18, was a fireman, second class, drawing $59 a month. In one year and a half he would have been eligible for promotion to fireman, first class, with an increase in his base pay of $6 a month. The claimant is his mother, aged 40. When he was 8 months of age his father died, and his mother married her present husband in 1910. His mother testified that he sent her "from $15 to $25 a month." Her pecuniary loss is fixed at $4,500.

Frank L. Mims, aged 21, was a fireman, third class, drawing $65 a month. In 1 year and 6 months he would have been eligible for promotion to machinist's mate, second class, with an increase in base pay of $12 a month. The claimant is his mother, aged 36, who had received about $15 a month from her son. Her pecuniary loss is fixed at $2,800. Mrs. Mims has been separated from her husband for several years. She has five other children, who have apparently had the benefit of the contributions made by the deceased. But he gave the money to her, and the award should go to her.

 Robert S. Noble, aged 27, was a motor machinist's mate, first class, drawing $97.40 a month. He was on his third enlistment. In 3 years he would normally have become chief machinist's mate, with an increase in his base pay of $15 a month for the first year and of $42 a month thereafter. The claimant is his mother, aged 54, who has been a widow since December, 1929. For 3 years he had given his mother $40 a month. Her pecuniary loss is fixed at $5,500. There is no basis for any award to the sister of the deceased.

 Harlow Milton Pino, aged 28, was a lieutenant, junior grade. He was graduated from the Naval Academy in 1921. His pay was $193 a month. In ordinary course he would have become a lieutenant in 1927, and lieutenant commander in 1941. His family consists of father and mother, two brothers, and a sister. There is no proof of any contribution to his father or his brothers or his sister. The sole possible beneficiary is his mother, aged 50. She testified that the deceased possibly gave her approximately $25 a month, but this amount seems to be a mere estimate of the value or aggregate of gifts to her from time to time when her son was at home. The family is evidently in prosperous financial condition; the father has retired, and lives on his income from investments, and he has established a trust fund for his wife and children. I infer that the deceased did not consider it necessary to contribute. There is some proof of a vague promise by Lieut. Pino to reimburse his mother for money received by him while he was at the Naval Academy, "possible $500 a year"; but he had not made any payment on account of this. In fact, he was himself in debt when he died. The only possible pecuniary loss that the mother sustained is the loss of repayment of advances, the amount of which is doubtful, since no account of them was kept. Her pecuniary loss is fixed at $1,000.

 James Moreland Schofield, aged 22, was a radioman, first class, drawing $89 a month. The claimants are his aunt, Leah Schofield, aged 45, and sister, Alice Redfern, aged 33, both married. The mother of the deceased died when he was 7, and Mrs. Schofield brought him up. She testified to contributions of $5 a month. Her pecuniary loss is fixed at $750. There is no proof of pecuniary loss on the part of Mrs. Redfern. The deceased once gave her $200 to buy a car, and he made small gifts at other times when he visited her.

 Frank Archibald Shea, aged 24, was an electrician's mate, first class, drawing $97.40 at death. He was on his second enlistment, and had been recommended for promotion. The claimant is his wife, aged 23. Subsequently, on September 8, 1926, she married Lloyd B. Hazel, and on September 6, 1928, she died. The only proof of contribution by the deceased to his wife is the testimony of her second husband that she had often said that the deceased sent her $70 a month. Although no objection was made to this testimony at the hearing, counsel for the United States now contends that there is no legal evidence of any contribution. I think the objection comes too late. Moreover, there

342

is a reasonable presumption that he supported his wife. The wife's pecuniary loss is limited in duration and extent to her lifetime. Sider v. General Electric Co., 238 N. Y. 64, 143 N. E. 792, 34 A. L. R. 158; Matter of Meekin v. Brooklyn Heights Railroad Co., 164 N. Y. 145, 58 N. E. 50, 51 L. R. A. 235, 79 Am. St. Rep. 635; Pitkin v. New York Central & Hudson River Railroad Co., 94 App. Div. 31, 87 N. Y. S. 906; Cooper v. Shore Electric Co., 63 N. J. Law, 558, 44 A. 633. These cases, together with analogies drawn from Chicago, Burlington & Quincy Railroad Co. v. Wells-Dickey Trust Co., 275 U. S. 161, 48 S. Ct. 73, 72 L. Ed. 216, 59 A. L. R. 758; Reading Co. v. Koons, 271 U. S. 58, 46 S. Ct. 405, 70 L. Ed. 835; Union Steamboat Co. v. Chaffin's Adm'rs (C. C. A.) 204 F. 412, and Carson v. Gore-Meenan Co. (D. C.) 229 F. 765, negative the government's contention that all right of recovery under this statute lapsed on her death. The pecuniary loss is fixed at $1,500.

■ John J. Sheehan, aged 25, was a motor machinist's mate, first class, drawing $97.40 a month. He was on his second enlistment. In 2 years and 7 months he could have expected promotion to chief machinist's mate at an increase in base pay of $15 a month for the first year and $42 a month thereafter. The claimants are his wife, aged 23, and a daughter, Gloria Ann Sheehan, aged 4. His wife, whom he married September 13, 1920, testified that all his pay, save $10 a month, went to support the family. Mrs. Sheehan remarried December 28, 1927. The pecuniary loss in this case is fixed at $14,000. This sum is apportioned $8,000 to the mother and $6,000 to the child.

■ Herbert F. Snyder, aged 25, was chief signalman, drawing $149.90 a month. He was on his third enlistment. The claimant is his wife, aged 25, whom he married July 11, 1925. She remarried April 1, 1930. During the 2 months that she was married to the deceased, he paid their board and gave her $50 a month. Her pecuniary loss is fixed at $15,000.

■ Augustus Alexander Smith, aged 27, was a torpedoman, second class, drawing $87.80 a month. He was on his third enlistment. He was eligible for promotion to torpedoman, first class, with an increase of $12 a month in his base pay. The claimants are his wife, aged 19, and a son, Albert Ashton Smith, aged 3 months. His wife, whom he married July 23, 1924, testified that he contributed $75 a month to the family support. The pecuniary loss in this case is fixed at $13,000. This sum is apportioned $7,500 to the mother and $5,500 to the child.

■ Frederick Peter Teschemacher, aged about 19, was a seaman, first class, drawing $59 a month. In 8 months he would probably have become coxswain, and in 2 years and 2 months boatswain's mate. His mother, aged 46, had received $20 a month from him. Her pecuniary loss is fixed at $3,000.

William Charles Teschemacher was a twin brother of Frederick Peter Teschemacher, with the same rank and pay; and he contributed the same amount to his mother. Her pecuniary loss is fixed at $3,000.

■ Charles C. Thomas, aged 21, was a fireman, second class, drawing $59 a month. He was one of a large family, and left home on his mother's death in 1921. He was almost halfway through his first enlistment. He came home from time to time when he was out of work. The claimant is his father, aged 71, to whom, prior to enlistment, he once gave $20. His father testified that, after enlistment, he wrote that, if his father and his younger brother, would settle down together he would send part of his wages after he got started in his work. The father testified that he had lived for 8 or 9 years with one of his daughters, and did not mention his younger son again. Apparently he had a stroke in 1929. If it were permissible to assume that the deceased, had he lived, would probably have helped his father, the amount would still be left to imagination. In the absence of any contribution, it is idle to speculate about what the deceased might have done. There is no proof of pecuniary loss.

■ Stephen H. Triffitt, aged 24, was a torpedoman, third class, drawing $71 a month. He was on his second enlistment. He was eligible and had been recommended for promotion to torpedoman, second class, which would have increased his base pay $12 a month. One year and 6 months from the date of his death he would have been eligible for promotion to torpedoman, first class, with a further increase of $12 a month in his base pay. The claimant is his mother, aged 57, to whom in 1925 he had allotted $20 a month. She says he gave her "around $20 besides" each month. Her pecuniary loss is fixed at $5,000.

■ Robert Holland Wills, aged 28, was a torpedoman, first class, drawing $97.40 a month. He was on his second enlistment, but could not have expected promotion unless he re-enlisted. The claimant is his mother,

aged 56. Her first husband, father of the deceased, died in 1903, and in 1919 she married her present husband. The mother testified that her son gave her $60 a month. In explanation of this rather unusual contribution, it appears that she suffers from rheumatism, and had been under expense for treatment. Her pecuniary loss is fixed at $6,000.

■ Francis C. Wiseman, aged 25, was a torpedoman, third class, drawing $71 a month. He was on his second enlistment. In one month he would have become eligible for promotion to torpedoman, second class. The claimant is his mother, aged 53, to whom he contributed continuously over a considerable period $50 a month. She has been a widow since 1927, and lives with three of her children. She set aside half of her son's contribution for his benefit. But this was her own idea; it was an absolute gift. Out of this accumulation she paid the expense of his burial. Her pecuniary loss is fixed at $6,500.

The foregoing amounts, as apportioned, are awarded in each case to the legal representatives of the deceased. The death claims are entitled to priority in payment. In the similar case of The Steel Inventor the commissioner's report expressly allowing the death claimants priority over all other claimants was confirmed by this court. The Steel Inventor, 36 F.(2d) 399, reversed on other grounds, 43 F.(2d) 958, 1930 A. M. C. 1468. The fact that a government vessel is involved does not alter the incidence of the limitation proceeding. In re United States Steel Products Co. (C. C. A.) 24 F.(2d) 657. It is stipulated that the damages sustained by the United States as owner of the submarine S-51 are $950,000, and that the damages sustained by the City of Rome are $17,972.52.

Kirlin, Campbell, Hickox, Keating & Mc-Grann, of New York City, for petitioner Ocean S. S. Co. of Savannah.

Bigham, Englar, Jones & Houston, of New York City, for claimants Dobson, Egber and Haselden.

Lucien V. Axtell, of New York City, for claimant Charles T. Mims.

Robert E. Manley, of New York City (Horace M. Gray, Sp. Asst. U. S. Atty., of New York City), for the United States.

William A. Ryan, of Brooklyn, N. Y., for claimant Berk and others.

Barry, Wainwright, Thacher & Symmers, of New York City, for other petitioners.

CAFFEY, District Judge.

I have examined the authorities cited, and have considered the arguments I agree with the conclusions of the commissioner, and feel that the grounds assigned in the report adequately sustain him. In consequence, there is no need for extended discussion. Accordingly, I shall content myself with adding only a few brief comments.

■ 1. While the question raised with respect to the remarriage of widows seems not heretofore to have been squarely passed on by a federal court, the doctrine prevailing in the state courts (report, ante, pp. 336–343) impresses me as right, as certainly it is far preferable in application to the consequences which would ensue from adopting a different doctrine, and I think its acceptance is plainly required if harmony is to be preserved with a closely related proposition which has been settled by the Supreme Court of the United States.

The best basis I have seen in the state decisions for refusing to mitigate damages of a widow because of remarriage is stated in Georgia Railroad & Banking Company v. Garr, 57 Ga. 277, 280, 24 Am. Rep. 492, and St. Louis, I. M. & S. Ry. Co. v. Cleere, 76 Ark. 377, 386, 88 S. W. 995. If we should enter upon an inquiry as to the relative merits of the new husband as a provider, coupled with his age, employment, condition of health, and other incidental elements concerning him, unavoidably we should embark upon a realm of speculation and be led into a sea of impossible calculations. Moreover, adherence to the rule followed by the commissioner seems essential to consistency with the holding that, upon the death of the first husband, there was "an immediate, final and absolute vesting" in his widow, if the statutory beneficiary, of a cause of action on that account. C., B. & Q. R. R. v. Wells-Dickey Trust Co., 275 U. S. 161, 163, 164, 48 S. Ct. 73, 72 L. Ed. 216, 59 A. L. R. 758.

■ 2. Payment of death claims in full does not rest for support exclusively on The Steel Inventor (D. C.) 36 F.(2d) 399, as seems to have been assumed by some counsel. On the contrary, under decisions of the Supreme Court of the United States itself, I see no escape, on the facts of the case at bar, from priority to the death claimants.

It was unequivocally determined in United States v. The Thekla, 266 U. S. 328, 45 S. Ct. 112, 69 L. Ed. 313, that, by coming into this proceeding to litigate its claim, the Unit-

ed States put itself upon the plane of, and subjected itself to the law measuring the rights of, the private owner of a vessel engaged in collision. It is also established by The Hamilton, 207 U. S. 398, 406, 407, 28 S. Ct. 133, 52 L. Ed. 264, that, as between the private owner who seeks damages for his lost ship and the successors in interest to those aboard that ship who perished by her sinking, the death claimants must be paid first. By coupling the two cases mentioned, The Steel Inventor is completely sustained.

It is urged that the death claimants cannot recover in direct suits against the government, Dobson v. United States (C. C. A.) 27 F.(2d) 807—in part because members of the naval service are provided for by a pension system. This, however, seems to me to be entirely beside the point. One reason why nonliability of the sovereign is immaterial is that, inasmuch as the limitation fund arises wholly from a nongovernment vessel, the cause of action of the death claimants is predicated solely upon the fault of the ship that survived the collision, and may be maintained regardless of whether the other ship was at fault, Erie R. R. Co. v. Erie Transportation Co., 204 U. S. 220, 225, 226, 27 S. Ct. 246, 51 L. Ed. 450. In consequence, the relation to the United States, called by counsel the employment status, of those who lost their lives in the S–51, is irrelevant to the inquiry on which we are engaged. As said, in regard to this very matter, in The Hamilton, at page 406 of 207 U. S., 28 S. Ct. 133, 135, the contract between the seaman who was drowned on and the owner of the sunken ship "does not affect the case." If the death claimants were subordinated to, or even placed on an equality with the government, in its capacity as a shipowner who has intervened to prosecute its claim against the limitation fund, I think clearly they would be deprived of a right to which, as between themselves and the City of Rome, they are entitled.

3. So far as I can discover, no award was made by the commissioner to a child for a period beyond infancy. However, if the total going to a widow and her child be not excessive, then it seems to me that the apportionment, even though it were somewhat liberal to the child, might well be treated, on complaint of the only objectors here involved, as damnum absque injuria. After review of the gross going to a mother and her child or children in the cases of numerous claimants, I find none in which it was greater than it should be.

4. The mother of fireman Mims is the only claimant who contends that an allowance is inadequate. When, however, all the facts are taken into account—including the hazardous nature of the occupation, the probability that a man of 21 will marry, the other reasonable probabilities with respect to the future course of a youth of the kind involved, the monthly contribution (as the proof shows) being about $15 and the age of the beneficiary being 36—I think that, when the table of mortality and the table of present value of a dollar are applied, the fixing of the damages at $2,800 is as nearly fair an approximation of the pecuniary loss as can be arrived at. At any rate, the commissioner was justified in reaching that figure, and there is no warrant for overruling him. Only indulgence in rank speculation would permit any substantial increase.

4. So far as concerns the amounts of particular recoveries by death claimants sought to be reduced, some exceptions might be disregarded because so general and because attention has not been drawn to portions of the record relied on. Nevertheless, I have gone over the proof bearing on many typical exceptions of all kinds and tested the calculations.

Undoubtedly the task of the commissioner was difficult. He has performed it with care. So far as I can see, he has given weight to nothing which was unfair and has not omitted to give weight to anything which was pertinent. Not alone was there some evidence to support him in every instance, but I have found no instance in which he appears to have committed an error.

6. Several principles of law insisted on by exceptants are indisputably sound. Nevertheless, they avail nothing, because there is no demonstrated illustration of failure by the commissioner to employ them.

The commissioner will be allowed $6,000 for his services.

Exceptions overruled, and report confirmed.